(C. D. 1139)

## A. C. Lawrence Leather Co. *v.* United States

United States Customs Court, First Division

(Decided November 24, 1948)

*Eugene R. Pickrell* for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*John J. McDermott* and *Richard F. Weeks*, special attorneys), for the defendant.

Before Oliver, Cole, and Mollison, Judges

Cole, Judge: · Fifty-three bales of sheep skins from Peru were imported by plaintiff, a corporation engaged in converting raw skins and hides into leather. The merchandise was classified as wool on the skin under paragraph 1102 (b) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1102 (b)), and assessed with duty on the basis of a clean content of 23 per centum, at the rate of 32 cents per pound. Plaintiff claims the importation is free of duty either under paragraph 1765 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1765) as raw skins, not specially provided for, or under the provision in paragraph 1681 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1681), for "fur skins, not specially provided for, undressed."

Plaintiff's case consists of testimony of two witnesses, both associated with the importing corporation; one, the vice president in charge of buying, selling, and manufacturing operations; and the other, foreman of the so-called "Chamois and Sulphiding Department," the branch of plaintiff's organization that processed the imported merchandise into leather for ultimate use as shoe lining, chiefly used for

women's shoes. They supply the details leading to the importation under consideration, an explanation of the nature of the present merchandise, and a description of the process followed, making the sheep skins in question available for their ultimate use. An analysis of their testimony follows.

The shipment in question is partial fulfillment of an order (collective exhibit 1) for 40,000 pounds of slats, a type of sheep skin from which "practically all wool has been removed or completely removed either by clipping or sweating." The merchandise actually received by plaintiff was not a strict compliance with the order. When, at the trial, an affidavit (collective exhibit 2), executed by the vice president 3 months after liquidation of the entry in question and stating that the importation consisted of "fifty-three (53) bales of Dry Salted Sheep Slats," was presented to the witness, he admitted making the statement, explaining that his "Receiving Department" had furnished the erroneous information, characterized as "definitely a case of carelessness," but that subsequent examination of the merchandise disclosed it to be 42 bales (numbers 1 to 21 and 33 to 53) of "dry sheep skin slats," as ordered, and 11 bales (numbers 22 to 32) of "dry salted sheep skins carrying about one inch of wool," not the kind of merchandise expected. The imported skins are not shearlings, differing therefrom in the type and quality of wool as well as in the physical area of the pelt. Shearlings are skins from an animal shorn prior to slaughter. The wool is of a fineness of approximately 56's, and about ¼ to 1 inch in length. They are tanned with the wool on them.

Bale No. 45, the only one examined by customs officials, was among the 42 bales consisting of slats. It contained 240 skins, having an aggregate weight of 365 pounds, averaging approximately 1.5 pounds per skin. The figures are based on a verification of weights taken by plaintiff upon arrival of the merchandise at its plant, with those set forth by the foreign shipper on the invoice.

The wool on all skins in question did not exceed 1 inch in length. The amount on each of the skins in the 42 bales of slats was negligible; "There wasn't any wool to pull" (R. 26). The skins in the remaining 11 bales had 1 inch of wool, "extremely poor, coarse, so-called doggie-type of wool, probably no more than forties wool count" (R. 36). It was susceptible of being pulled, so an investigation was made in the Boston wool market to determine the practicability of such an undertaking as a commercial proposition. Plaintiff was unable to find a dealer who was willing to handle the wool at any price, and experts in the wool market considered the wool to be of such poor quality there would be no market for it. If plaintiff had attempted the pulling operation, it would have resulted in a loss of 35 cents a skin.

None of the wool on any of the skins was preserved and used. The skins were placed in a "sulphide bath," where they remained for several hours, dissolving the wool that was drained away "through a plug or down a sewer." The skins were then pickled and further processed into a lower grade of leather, chiefly used as lining in women's shoes.

Defendant's sole witness was the United States wool administrator, whose duty is to observe "from reports as to what happens in the various ports throughout the country in connection with the importation of wool with the idea in mind to see that there is a uniformity in the classification of the commodity." (R. 64.) His examination of the shipment in question consisted of bale No. 45 only, which was already opened, the witness admitting that "possibly my examination wasn't the original examination in Public Stores." (The official papers disclose that the importation in question was first examined by Customs Examiner Devlin, deceased at the time of trial.)

The witness found bale No. 45 to contain "wool on the skin of a type that we normally refer to as shearlings in commercial terms. The skins were in a dry condition as taken from the slaughtered animals and had had a fiber growth on there of wool which varied in length possibly from one to, in some of the skins, over two inches. It was a run-of-the-mill importation that we identify as shearlings." (R. 64/65). The wool he saw was "a cross breed wool, as we generally term it, probably averaging between, well, about a bulk fifty-sixes." (R. 66.)

No official record was made of the number of skins in the bale nor was there any determination made of weights. The witness used no ruler, his determination of the length of the wool being just an approximation. He could not give the actual number of skins he examined, for length of the wool, but explained his action as follows: "As I was going through the bale, I was roughly looking at all of them. Some of them I picked up and handled, and it possibly could have been five or six of those were ones that I picked up that I examined better than the others" (R. 69). On the skins examined, he recognized bald spots, characteristic of such skins, which would "not necessarily" affect their suitability for use after importation.

This testimony is not a sufficiently comprehensive disclosure of the contents of bale No. 45 to serve as a contradiction of plaintiff's proof, which is based on an inspection of the entire importation as well as an investigation of the wool market. Furthermore, no official records or other documentary proof were offered to dispute plaintiff's evidence relating to the contents of bale No. 45. The most favorable statement to be made, supporting defendant's position, is that possibly 5 or 6 skins in bale No. 45 had wool exceeding 1 inch

in length, but certainly such a small quantity of the 53 bales in question cannot be regarded as representative of the importation.

The record before us is sufficient to find that, as a commercial proposition, it was unprofitable to pull the wool from the skins under consideration and use it, and that in processing the imported skins, plaintiff removed the wool beyond recovery. Under such circumstances, the wool loses tariff identity as such.

*United States* v. *Heckman*, 1 Ct. Cust. Appls. 272, T. D. 31318, construed the provision for "wools on the skin" contained in paragraph 360 of the Tariff Act of 1897 in this way:

* * * The skins with the wool on referred to in that paragraph are skins carrying such a quantity and character of wool as is valuable in itself as wool after being separated from the skin, and which it is profitable to remove from the skin on which it grew. It then becomes capable of entering into competition with domestic wool which the purpose of paragraph 360 is to protect.

The foregoing judicial interpretation has been consistently followed. *Ayres, Bridges & Co. et al.* v. *United States*, 8 Ct. Cust. Appls. 87, T. D. 37201; *United States* v. *Bennet*, 66 Fed. Rep. 299; *Domestic Broadtail Producers, Inc.* v. *United States*, 2 Cust. Ct. 32, C. D. 81.

There is nothing in the decisions of any of the cited cases, limiting the statutory phrase "wool on the skin" to only such wool imported for a fur use, as suggested by counsel for defendant. The controlling principle announced in the *Heckman* case, *supra*, and followed in the other cited cases, is that the "wool" on imported skins is not an all-embracive designation, intended to include under all conditions and in every circumstance the substance commonly known as wool, but is restricted to the commodity that has commercial value in itself as wool. Hence, imported skins with wool which cannot be profitably removed therefrom and is actually drained off and lost in processes, like the wool on the imported skins in question, are not within a tariff classification for wool.

The merchandise in all of the above-cited cases was found to consist of fur skins. The court, therefore, invoked a provision significant of such use. The same is not applicable to the present merchandise. On the contrary, the sheep skins in question were processed, removing the wool, and exclusively used as shoe lining leather. They are within the class of merchandise contemplated by the provision for raw skins, not specially provided for, in paragraph 1765, and free of duty thereunder, as claimed.

The conclusion finds support in the Summary of Tariff Information, 1929, a volume compiled by the United States Tariff Commission for use of the Committee on Ways and Means, in connection with its consideration of legislation ultimately enacted as the Tariff Act of 1930. Discussing paragraph 1666 of the Tariff Act of 1922, prototype of paragraph 1765, *supra*, the publication (page 2576) sets forth information

recognizing various classes of sheep skins, including "slats, dry and pickled," to be among the types of hides and skins classifiable under the tariff provision for raw skins and hides, not specially provided for.

The protests are sustained and judgment will be rendered accordingly.

Our disposition of the case makes it unnecessary to discuss plaintiff's alternative claim, relating to alleged improper customs examination under section 499 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, with consequent illegal and void liquidation.